ROBERTS, J.,
Dissenting.
¶ 83. The first issue in this case requires that this Court determine whether there was enough evidence to require granting David Jackson Williams’s request for a lesser non-included instruction on assisted suicide. The majority finds that there was insufficient evidence to justify instructing the jury on Williams’s defense theory that he assisted in Demetria Bra-cey’s suicide. But for the Mississippi Supreme Court’s clearly-established precedent to the contrary, I would agree with the majority. However, this Court is an intermediate appellate court, and as such, we have no authority to overrule or ignore the Mississippi Supreme Court’s prior decisions which require granting lesser non-included-offense instructions under circumstances similar to the facts present in this case. I would follow the clearly-established precedent on the issue, reverse Williams’s conviction, and remand this matter for a new trial. Accordingly, I respectfully dissent.
¶ 84. At the outset of my analysis, it is necessary to appropriately frame the issue on appeal. Williams claims the circuit court erred when it refused his request for a lesser non-included-offense instruction. Williams does not argue that the verdict is contrary to the weight of the evidence. Nor does he argue that there was insufficient evidence to support the jury’s verdict of guilt.
¶ 85. The necessary review on appeal is not complicated. A criminal defendant is entitled to a lesser-offense instruction where there is an evidentiary basis for it in the record. McGowan v. State, 541 So.2d 1027, 1028-29 (Miss.1989). In other words, an instruction must be submitted to a jury if there is credible evidence to support it. Anderson v. State, 571 So.2d 961, 964 (Miss.1990). ‘Where a party offers evidence sufficient that a rational jury might find for him on the particular issue, that party of right is entitled to have the court instruct the jury on that issue and through this means submit the issue to the jury for its decision.” Id.
¶86. The Mississippi Supreme Court has also held that a trial court must grant the instruction if, viewing the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences that may be drawn from the evidence in favor of the accused, a hypothetical, reasonable jury could find in favor *784 of the proponent of the instruction. Anderson, 571 So.2d at 964. In other words, in analyzing this issue, this Court is to review the evidence in the light most favorable to the defendant-and not in the light most favorable to the verdict.
¶ 87. Accordingly, our task in analyzing this issue is solely to determine whether there was sufficient evidence to justify a jury instruction. We are not asked to weigh the evidence. We are not asked to determine whether, in the light most favorable to the verdict, no juror could find that Williams was guilty of assisted suicide. Any inclusion of those matters in an analysis is entirely inappropriate and contrary to the necessary review on appeal.
¶ 88. Williams requested a lesser non-included-offense instruction on assisted suicide. If the requested instruction meets certain qualifications, the defendant is “entitled to a lesser-offense instruction the same as he would be entitled to a lesser-included-offense instruction.” Moore v. State, 799 So.2d 89, 91(¶ 7) (Miss.2001) (quoting Gangl v. State, 539 So.2d 132, 136 (Miss.1989)) (emphasis added). The Mississippi Supreme Court has recently reiterated that a defendant is entitled to a lesser non-included offense instruction under certain circumstances. Brooks v. State, 18 So.3d 833, 841 (¶ 36) (Miss.2009).
¶ 89. As mentioned, there are qualifiers to the requesting defendant’s entitlement. The lesser offense must arise out of a “nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment.” Moore, 799 So.2d at 91(¶7) (quoting Gangl, 539 So.2d at 136). That qualifier is not at issue. However, the majority bases its position on the second qualifier. That is, the evidence must warrant the instruction. Id.
¶ 90. A criminal defendant is entitled to a lesser-offense instruction where there is an evidentiary basis for it in the record. McGowan, 541 So.2d at 1028-29. In Williams v. State, 797 So.2d 372, 378(¶ 20) (Miss.Ct.App.2001), a defendant had been indicted for simple assault, and the trial court granted a lesser non-included offense instruction of disorderly conduct.[5] This Court found no error in the trial court’s decision to grant the lesser non-included-offense instruction. Id. at 379(¶ 25). In so doing, this Court stated that “[ijnstruc-tions should be granted or refused based on whether there is any evidence to support the requested instruction.” Id. at 379(¶ 24) (emphasis added). Accordingly, not only are such instructions appropriate if there is any evidence to support an instruction, as previously mentioned, in determining whether a lesser non-included-offense instruction is warranted by the evidence, the trial court was required to review the evidence in the light most favorable to Williams.
¶ 91. Williams sought a lesser non-included-offense instruction on assisted suicide. Mississippi Code Annotated section 97-3^49 (Rev.2006) provides:
A person who wilfully, or in any manner, advises, encourages, abets, or assists another person to take, or in taking, the latter’s life, or in attempting to take the latter’s life, is guilty of [a] felony and, on conviction, shall be punished by imprisonment in the penitentiary not exceeding ten years, or by fine not exceeding one thousand dollars, and by imprisonment in the county jail not exceeding one year.
*785 (Emphasis added). The circuit court refused Williams’s assisted-suicide instruction on the basis that Williams was only allowed an instruction on his theory of the case if that theory involved a lesser-inelud-ed offense.
¶ 92. Neither the prosecution nor defense counsel argued that the instruction was inappropriate due to any lack of evidence in the record justifying a jury conclusion that Williams had assisted in Dem-etria’s suicide. It is well-settled law that a party’s failure to state specific grounds for an objection to a jury instruction operates as a procedural bar to consider that issue on appeal. “In order to preserve a jury instruction issue on appeal, a party must make a specific objection to the proposed instruction in order to allow the lower court to consider the issue. Further, an objection on one or more specific grounds constitutes a waiver of all other grounds.” Morgan v. State, 741 So.2d 246, 253(¶ 15) (Miss.1999) (citations and internal quotations omitted). However, the majority declines to apply the procedural bar in this case, and gives no basis for its refusal to apply the well-established procedural bar.
¶ 93. In any event, the majority finds absolutely no evidence to support Williams’s requested instruction. I respectfully disagree with the majority’s characterization of the evidence. In my opinion, there was sufficient evidence to trigger the entitlement to a lesser non-included-offense instruction. To find otherwise is to ignore the precedent established by the Mississippi Supreme Court— and it is contrary to our mandate as an intermediate appellate court.
¶ 94. Williams consistently maintained that Demetria committed suicide. In his statement, which was admitted into evidence during the prosecution’s case-in-chief, Williams claimed that he and Demet-ria had discussed suicide since the summer of 2005. He stated that Demetria had him drive her to her bank so she could withdraw the entire balance of her checking account. He even entered Demetria’s PIN number at the ATM machine at Demetria’s request so that Demetria could withdraw all of her money. He claimed that Demet-ria withdrew her money so her mother, Glenda Hill, would not have any difficulties obtaining Demetria’s money after Demet-ria’s suicide. Glenda testified that, shortly before Demetria’s death, Demetria told her that she was keeping all of her money in her checkbook. Glenda further testified that it was very unusual for Demetria to reveal where she was keeping money. Law enforcement personnel recovered Demetria’s money from her purse. Dr. Arthur Copeland criticized Dr. Steven Hayne’s conclusion that Demetria’s death was a homicide. Dr. Copeland went on to testify that he could not precisely determine the manner of Demetria’s death, but his findings were “consistent with suicide.”
¶ 95. Jessica Smith, a friend of Demet-ria’s, testified that Demetria had missed band practice and that she had received calls from “the housing director and area coordinator” because Demetria could not be reached for work. Smith testified that it was not typical for Demetria to neglect her responsibilities. Williams told Agent John Marsh about talking to Smith because Smith was worried because Demet-ria “had been missing work and not going to band and all that.” During Agent Marsh’s interview, Williams said that he and Demetria did not go to class the week before she died.
¶ 96. Smith testified that she had spoken to Demetria days before Demetria died. According to Smith, Demetria sounded as though she had been crying. Demetria’s mother, Glenda, testified that she talked to Demetria on the Tuesday before Demetria died. Glenda testified *786 that Demetria was “kind of sniffling” and that the “conversation didn’t feel right.” Demetria’s atypical behavior and her crying could have been interpreted as indicative of her depressed mental state and/or her intent to fulfill her suicide pact with Williams. Additionally, Dr. Copeland testified that scars on Demetria’s arms were consistent with self-inflicted cuts seen in “cutters,” which occur when “one practices cutting themselves [sic] to get attention or [when] they are [sic] definitely in the need of psychological help.”
¶ 97. Additionally, Williams told Agent Marsh that Demetria “wanted to go to the bank and get her money out and put it in her purse so that her mom could get it.” Demetria “wasn’t sure that [her mother] could get access to the account.” Demet-ria’s mother, Glenda, stated: “something strange [was] going on but I didn’t know what and [Demetria] said[,] ‘I’m saving money to buy my first car and I’m saving it in my eheckbook[,]’ and that is not like her. She usually doesn’t tell anybody where she keeps her money at all[,] and I thought it was strange[,] but I overlooked it.” Demetria’s withdrawal of all of the money in her checking account, and notifying her mother where it could be found, could have been interpreted as Demetria’s plan to fulfill the suicide pact she and Williams had formed.
¶ 98. What is more, the concept that Williams and Demetria had a suicide pact permeated the trial. Agent Marsh testified that Williams told him and Detective Jimmy Williams that he and Demetria had “a suicide pact where they decided they were going to commit suicide.” Detective Williams also testified that Williams said he and Demetria had a suicide pact. En-joli Canankamp also repeatedly testified that Williams had told her that he and Demetria had a suicide pact.
¶ 99. Williams told Agent Marsh and Detective Williams that Demetria had “stabbed herself’ and that he had “attempted to stab himself.” Agent Marsh then reiterated that Williams “said that [Demetria] had stabbed herself.” Later during the interview, Williams did not correct Agent Marsh when Agent Marsh attempted to clarify that Demetria “had stabbed herself.” During redirect, Agent Marsh testified that Williams said Demet-ria had stabbed herself and that “[t]hey were going to stab themselves simultaneously.” Detective Williams also testified that Williams said Demetria had stabbed herself.
¶ 100. In fact, the prosecution introduced a transcript of Agent Marsh’s interview of Williams. During that interview, Williams said:
We had kind of talked about committing suicide together and stuff like that and we decided we were going to do it last week and she came over, it was Sunday. We just hung out together, didn’t go to class, she didn’t work, um and we just hung out for a couple of days and decided that we were going to do it that night and she, we both drank a lot and took some pills but it wouldn’t help the pain, you know. And we decided to do it in the closet so it would take longer for people to find us if somebody showed up looking for us and we got knives and went in there and we decided to do it at the same time and mine didn’t go as far in.
Canankamp testified that she and Williams had discussed the events surrounding Demetria’s death. Canankamp testified as follows:
we went to the park and we talked over the phone the whole entire time. I asked him exactly, I just wanted some answers for myself. Some closure to have some kind of idea. And asked him *787 exactly what happened. Was it where they did each other? Was it like Romeo and Juliet? What was the deal? At the time he explained that she was going to do him — and that he was going to do himself and she was going to do herself and they had drank a lot of alcohol and took several pills to do that. And that after taking all the pills, he didn’t feel, he felt weak and passed out from it and woke up several days later, off and on he would see her.
(Emphasis added). The following exchange also occurred during Canankamp’s testimony:
Q. So he described how they were to perform this suicide pact[?]
A. Yes.
Q. And tell the, ladies and gentlemen of the jury, what he said how that happened?
A. That they took a lot of medications and that they had drank and she was going to do herself and he was going to do himself
[[Image here]]
Q. Did he describe how this was going to be carried out?
A. From me asking him, from the times the day that I asked him he said that he was going to do himself and she was going to do herself and he showed me like several wounds to himself that he inflicted he said on himself.
[[Image here]]
Q. What did he say about how they were going to accomplish the suicide pact?
A. My question to him was, was he going to do her was she going to do him was it Romeo and Juliet style. What was it and his exact statement was, I was going to do myself and she was going to do herself
(Emphasis added).
¶ 101. There was conflicting testimony from the experts called at trial. Dr. Hayne concluded that the manner of Dem-etria’s death was a homicide, rather than a suicide. However, Dr. Copeland emphatically testified that Dr. Hayne “[immediately jumped the gun [and] called [Demet-ria’s death] a homicide from the get[-]go.” Dr. Copeland repeatedly testified that the manner of Demetria’s death was “consistent with suicide.”
¶ 102. Dr. Hayne testified that it would have taken “considerable” or “significant” force to cause the injury that killed Dem-etria. However, Dr. Copeland contradicted Dr. Hayne’s characterization. Dr. Copeland noted that the fatal wound did not go through bone-it went through the “cartilaginous segment” between Demet-ria’s ribs. Dr. Copeland elaborated that such tissue is “not all that difficult for a knife to get into.” Dr. Copeland further testified that such tissue is “not all that difficult to penetrate.”
¶ 103. There was no testimony from Dr. Hayne, Dr. Earnest Lykissi, or Dr. Copeland that Demetria would have been too intoxicated to stab herself. Likewise, no expert testified unequivocally that Demetria was incapacitated by alcohol consumption at the time of her death. The evidence indicated that Demetria’s blood-alcohol content was approximately .4 when she died. Dr. Lykissi testified that people with a blood-alcohol content of .4 would generally be “ready for the undertaker,” but he also testified that there were exceptions to that general statement. Dr. Lyk-issi testified that he personally experienced a case in which a sailor had a blood-alcohol content of .7. According to Dr. Lykissi, that sailor had a cup of coffee and then walked out of the emergency room.
*788 1f 104. To be clear, the testimony regarding Demetria’s level of intoxication and her capacity to commit suicide at that time contradict the likelihood that Demet-ria committed suicide, but that evidence does not unequivocally exclude the possibility that suicide was the cause of Demet-ria’s death. It bears repeating that, in analyzing this issue, we are not to weigh the evidence. We are merely required to determine whether there was substantial evidence to require the circuit court to grant Williams’s request for an assisted-suicide instruction. The evidence of Dem-etria’s level of intoxication did not unequivocally contradict the evidence that Demetria had committed suicide. It is noteworthy that, under the circumstances, substantial evidence has been described as more than a scintilla of evidence. Even when viewed alongside evidence that Dem-etria was intoxicated, there is still more than a scintilla of evidence that Demetria could have committed suicide because the intoxication/incapacity evidence merely suggested that it was less likely that Dem-etria could have committed suicide — it did not exclude the possibility.
¶ 105. Dr. Hayne testified that there were four reasons that led him to exclude suicide as the manner of Demetria’s death: (1) the angle and depth of the fatal wound, (2) the presence of injuries to Demetria’s neck, (3) the absence of “hesitation” marks, and (4) the abrasion on the back of Demetria’s hand. It is noteworthy that Dr. Hayne did not include Demetria’s intoxication level among those reasons.
¶ 106. Although Dr. Hayne testified that the angle and the depth of the fatal wound were inconsistent with suicide, Dr. Copeland contradicted Dr. Hayne’s conclusion. As for the angle of the fatal wound, according to Dr. Copeland, the angle was “consistent with suicide.” Dr. Copeland testified that “a person could take a knife themselves [sic] and inflict it into their [sic] body this way.”
¶ 107. Dr. Hayne’s inclusion of the depth of the fatal wound seems to have been linked to the force required to inflict that wound. Dr. Hayne testified that it would have taken “considerable” or “significant” force to cause the injury that killed Demetria. Again, Dr. Hayne did not testify that Demetria was too intoxicated to muster the force necessary to inflict the fatal wound. In any event, Dr. Copeland contradicted Dr. Hayne’s characterization of the force required to inflict the fatal wound. Dr. Copeland noted that the fatal wound did not go through bone. Instead, the fatal wound passed through the “cartilaginous” tissue between Demetria’s ribs. Dr. Copeland elaborated that such tissue is “not all that difficult for a knife to get into.” Dr. Copeland further testified that such tissue is “not all that difficult to penetrate.”
¶ 108. As for the small injuries to Dem-etria’s neck, as previously mentioned, Dr. Hayne testified that he found bruises on the sternocleidomastoid muscles in Demet-ria’s neck as well as soft tissue hemorrhaging in her neck and bruising in the area of her larynx. Dr. Hayne opined that the injuries to Demetria’s neck were consistent with strangulation that was not self-inflicted, but was sustained while she was alive.
¶ 109. However, Dr. Copeland vigorously contradicted Dr. Hayne’s findings. Dr. Copeland testified that he reviewed Dr. Hayne’s autopsy report and that he disagreed with Dr. Hayne’s conclusion regarding the suggestion of manual strangulation. Dr. Copeland testified that Dr. Hayne failed to dissect the tissues around Demetria’s neck. Dr. Copeland also testified that what Dr. Hayne concluded was hemorrhaging could have been changes that occur with decomposition. Dr. Copeland further noted the absence of other *789 indications of strangulation, such as “pe-techia,” which he described as “small minute pinpoint hemorrhages” that appear “[l]ike a little tiny dot.” Dr. Copeland went on to testify that there were no other indications of manual strangulation, such as Demetria having broken fingernails or “offensive” injuries to Williams. According to Dr. Copeland, the evidence that Dr. Hayne attributes to strangulation was likely caused by decomposition.
¶ 110. As for the third basis for Dr. Hayne’s conclusion regarding the manner of Demetria’s death, Dr. Hayne noted that the absence of “hesitation” marks on Dem-etria’s body contradicted the possibility that she had committed suicide. However, on cross-examination, Dr. Hayne testified that hesitation marks do not always accompany deaths by suicide. Dr. Copeland also testified that the lack of hesitation marks did not rule out the possibility of suicide as the manner of Demetria’s death.
¶ 111. Finally, Dr. Hayne implied that the presence of an “abrasion” on the back of one of Demetria’s hands could have been a defensive wound, meaning a wound that one sustains while defending against an attack. However, Dr. Hayne also testified that the abrasion injury to the back of one of Demetria’s hands was not necessarily a defensive wound-it was only consistent with a defensive wound. Dr. Copeland testified that Demetria could have sustained the abrasion in other ways aside from defending herself from Williams.
¶112. The position advocated by the majority is based on the conclusion that no evidence supports the concept that Williams advised, encouraged, abetted, or assisted Demetria in committing suicide. Respectfully, the majority’s position ignores the substantial evidence that Williams and Demetria had a suicide pact. By agreeing to commit suicide together, each member of the pact was encouraged, to commit suicide because they no longer had to face the possibility of committing suicide alone. Williams and Demetria were lovers. The suicide pact could easily be interpreted as an agreement between them that “if you are going to kill yourself, I do not want to continue to live without you, so I will likewise kill myself.” Williams’s statement indicated that he had attempted to commit suicide, but could not muster the courage to do so. A photograph that was introduced into evidence showed that Williams had cuts on his chest, and the testimony at trial demonstrated that Williams’s blood was found in numerous places in his apartment. Based on Williams’s statement, he and Demetria both drank a substantial amount of alcohol to gain the courage to commit suicide. Viewed in the light most favorable to Williams, by drinking together, he and Demetria were each encouraged to commit suicide. It bears repeating that the statute that prohibits assisting suicide includes language that encouragement or assistance “in any manner” may be a punishable act.
¶ 113. Additionally, there was other evidence that Williams encouraged Demetria to commit suicide. During Agent Marsh’s interview of Williams, Williams stated that he and Demetria had been discussing suicide since the previous summer. According to Williams, he talked about committing suicide more than Demetria did, “but she wanted to do it with me.” Williams also stated that he “probably brought it up in her mind.” Additionally, a reasonable person could have also concluded that, by providing the place to commit suicide and the kitchen knives to accomplish the task, Williams assisted Demetria in committing suicide. It is necessary to remember that our task in analyzing this issue is solely to determine whether there was sufficient evidence to justify a jury instruction-not to *790 weigh the evidence.[6] Again, a criminal defendant is entitled to a lesser-offense instruction where there is an evidentiary basis for it in the record. McGowan, 541 So.2d at 1028-29.
¶ 114. Contrary to the substance of the majority’s opinion, the assisted-suicide statute does not require that the contemplated assistance or encouragement be persuasive, direct, or significant. Assistance or encouragement “in any manner” is sufficient to constitute the crime. As previously mentioned, a defendant is entitled to a lesser non-included-offense instruction “where there is evidentiary support that a defendant is guilty of a lesser charge arising from the same nucleus of operative facts.” Green v. State, 884 So.2d 733, 737(¶ 12) (Miss.2004) (citing Mease v. State, 539 So.2d 1324, 1329 (Miss.1989)). “In fact, proposed instructions should generally be granted if they are correct statements of law, are supported by the evidence, and are not repetitious.” Id. at (¶ 13).
¶ 115. In essence, assisted suicide is synonymous with being an accessory-before-the-fact to self-murder. “Any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an ‘aider and abettor[.]’ ” Swinford v. State, 653 So.2d 912, 915 (Miss.1995). “[S]uch aiding and abetting may be manifested by acts, words, signs, motions, or any conduct which unmistakably evinces a design to encourage, incite or approve of the crime, or even by being present, with the intention of giving assistance.” Id. (citation omitted). “A person who wilfully, or in any manner, advises, encourages, abets, or assists another person to take, or in taking, the latter’s life, or in attempting to take the latter’s life, is guilty of’ assisting a suicide. Miss.Code Ann. § 97-3-49 (emphasis added).
¶ 116. There are numerous cases regarding the participation necessary to qualify as an accessory-before-the-fact. See Turner v. State, 573 So.2d 1340 (Miss.1990); Gowdy v. State, 592 So.2d 29 (Miss.1991); Bolton v. State, 831 So.2d 1184 (Miss.Ct.App.2002). In Swinford, the Mississippi Supreme Court affirmed a conviction for murder as an accessory-before-the-fact under the following facts:
There is no dispute that George Johnson killed Jamie Medlin. Nor is there any dispute that defendant [Darla Jo] Swin-ford was present at the time of the killing and also arranged for Jamie Med-lin to be at the place where the killing took place. Swinford testified that she suspected trouble when she saw Johnson arrive with a gun. She readily admitted that she did nothing, knowing that Johnson stood armed talking with Medlin for approximately thirty minutes. She neither tried to stop the discussion or leave for help. There is also no dispute that she subsequently traveled with Johnson and Branum to Florida with packed bags.
Swinford testified that she only thought that Johnson wanted to talk to Medlin on the day of the murder and that she *791 traveled to Florida with the boys out of fear. However, this testimony does not support the verdict and is in fact refuted by [another witness’s] testimony that Swinford knew of the plan to kill Medlin. There exists ample evidence in support of Swinford’s murder conviction. Swin-ford’s actions met the requirements for aiding and abetting, and therefore her conviction for murder stands affirmed.
Swinford, 653 So.2d at 915. Viewing the evidence in the light most favorable to the verdict, the defendant in Swinford knew about the plan to kill the victim, arranged for the victim to be present, and was present during the crime. That evidence was sufficient to find beyond a reasonable doubt that the defendant in Swinford aided, assisted, or encouraged the commission of murder. Stated differently, knowledge of the planned crime, indirect participation in the planned crime, and presence during the commission of the planned crime is sufficient evidence to convict a defendant beyond a reasonable doubt as an accessory-before-the-fact. It follows that the facts in the case sub judice, which must be viewed in the light most favorable to Williams, must qualify as sufficient evidence to trigger Williams’s entitlement to a lesser-non-included offense instruction. This is especially true where, according to Williams’s own statement, he talked about committing suicide more than Demetria did, “but she wanted to do it with [him] ... [and he] probably brought it up in her mind.”
¶ 117. To be entirely clear and forthcoming, my opinion is not based on the premise that I agree with the merits of a legal entitlement to lesser non-included-offense instructions. Mississippi Code Annotated section 99-19-5(1) (Rev.2007) provides:
On an indictment for any offense the jury may find the defendant guilty of the offense as charged, or of any attempt to commit the same offense, or may find him guilty of an inferior offense, or other offense, the commission of which is necessarily included in the offense with which he is charged in the indictment, whether the same be a felony or misdemeanor, without any additional count in the indictment for that purpose.
Accordingly, section 99-19-5(1) permits a jury to convict an individual for a lesser-included offense, but it does not address lesser non-included offenses. No Mississippi statute authorizes a jury to convict a defendant for a lesser non-included offense.
¶ 118. The United States Supreme Court has unequivocally rejected the concept that a defendant is entitled to a lesser non-included-offense instruction. Hopkins v. Reeves, 524 U.S. 88, 97, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). The Supreme Court held that such an entitlement would be “not only unprecedented, but also unworkable. Under such a scheme, there would be no basis for determining the offenses for which instructions are warranted.” Id. In Schmuck v. United States, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the United States Supreme Court resolved whether it would utilize an “elements test” or an “inherent-relationship approach” in interpreting Federal Rule of Criminal Procedure 31(c)(1), which provided, in part, that a “defendant may be found guilty of ... an offense necessarily included in the offense eharged[.]” Adopting the more stringent “elements test,” the Schmuck Court noted as follows:
Were the prosecutor able to request an instruction on an offense whose elements were not charged in the indictment, this right to notice would be placed in jeopardy. Specifically, if, as mandated under the inherent[-]relationship approach, the determination wheth *792 er the offenses are sufficiently related to permit an instruction is delayed until all the evidence is developed at trial; the defendant may not have constitutionally sufficient notice to support a lesser[-]included[-]offense instruction requested by the prosecutor if the elements of that lesser offense are not part of the indictment. Accordingly, under the inherent[-]relationship approach, the defendant, by in effect waiving his right to notice, may obtain a lesser[-]offense instruction in circumstances where the constitutional restraint of notice to the defendant would prevent the prosecutor from seeking an identical instruction.
Schmuck, 489 U.S. at 718, 109 S.Ct. 1443.
¶ 119. Additionally, in the context of a prosecution of a felony, the entitlement to a lesser non-included offense instruction is contrary to Article 3, Section 27 of the Mississippi Constitution of 1890, which provides that: “No person shall, for any indictable offense, be proceeded against criminally by information except in cases ... where a defendant represented by counsel by sworn statement waives indictment.” The record contains no evidence that Williams waived formal indictment on assisted suicide and proceeded on a bill of information.
¶ 120. Further criticism of the concept of an entitlement to a lesser non-included-offense instruction has been raised on the basis that “[a]n accused should not have the unrestricted light to search the statute books for some other related but not lesser-included offense with a lesser punishment, and insist upon an instruction on that crime.” Barber v. State, 743 So.2d 1054, 1059(¶ 19) (Miss.Ct.App.1999) (Southwick, P.J., dissenting). “In effect an accused can indict himself for an offense that is not within the actual indictment but is potentially within the facts and carries a lesser sentence.” McDonald v. State, 784 So.2d 261, 266(¶ 20) (Miss.Ct.App.2001) (Southwick, J., concurring). In other words, “this court-created right to a lesser non-included[-offense] instruction effectively allows a defendant to choose the crime for which he is indicted.” Brooks v. State, 18 So.3d 859, 876(¶ 48) (Miss.Ct.App.2008) (Carlton, J., dissenting) (overruled in part). Yet another important consideration regarding the merits of awarding a defendant an entitlement to a lesser non-included instruction has been stated as follows:
In the original case that unleashed us on [the] journey into non-included[-]offense instructions, the [supreme court] said “whether simple assault is formally a lesser included offense to rape is not the point.” Griffin v. State, 533 So.2d 444, 447 (Miss.1988). With respect for the [supreme court] and the author of that opinion, that should be and had before then been exactly the point. If the elements on the lesser offense are all in the greater offense, then what is in the lesser[-]offense instruction will necessarily have been examined fully in the trial.
McDonald, 784 So.2d at 269-70(¶40) (Southwick, P.J., concurring).
¶ 121. Other jurisdictions have shared Judge Southwiek’s concerns. In 1984, the California Supreme Court adopted the lesser non-included-offense-instruction doctrine in People v. Geiger, 35 Cal.3d 510, 199 Cal.Rptr. 45, 674 P.2d 1303 (1984). After fourteen years’ experience, California reversed course and joined the majority of jurisdictions that do not permit such jury instructions. See People v. Birks, 19 Cal.4th 108, 77 Cal.Rptr.2d 848, 960 P.2d 1073, 1074 (1998). In rejecting the concept of a defendant’s entitlement to lesser non-included-offense instructions, the California Supreme Court stated as follows:
The rule [prohibiting lesser non-included-offense instructions] also accords both parties equal procedural treatment, *793 and thus benefits and burdens both to the same degree. Neither party is unfairly surprised by instructions on lesser necessarily included offenses because, by definition, the stated charge gives notice to both that all the elements of any such offense are at issue. By the same token, neither party has a greater right than the other either to demand, or to oppose, instructions on lesser necessarily included offenses. Finally, if lesser offenses are necessarily included in the charge the prosecution has chosen to assert, instructions on the lesser offenses, even when given over the prosecution’s objection, cannot undermine the prosecution’s traditional authority to determine the charges.
Id. at 1074 (emphasis added). The California Supreme Court also noted that the entitlement to lesser non-included-offense instructions “gives the defendant a superi- or trial right to seek and obtain conviction for a lesser uncharged offense whose elements the prosecution has neither pled nor sought to prove.” Id. at 1075. Finally, the California Supreme Court expressed its concern that “[b]y according the defendant the power to insist, over the prosecution’s objection, that an uncharged, non[-]included offense be placed before the jury, the [entitlement to a lesser non-included-offense instruction] may usurp the prosecution’s exclusive charging discretion, and may therefore violate the Constitution’s separation of powers clause.” Id. In other words, the “entitlement” to a lesser non-included-offense instruction affords the defense a tactic that the prosecution may not itself utilize.[7]
¶ 122. To best illustrate the point, if Williams had been indicted for murder as a habitual offender pursuant to Mississippi Code Annotated 99-19-83 (Rev.2007), and the prosecution had sought a jury instruction on the lesser non-included offense of assisted suicide, defense counsel would most certainly have strenuously objected on the basis that Williams had not been charged with assisted suicide. Defense counsel would have also argued that assisted suicide was not a lesser-included offense of murder, and that he was not prepared to defend an assisted-suicide charge. Defense counsel would have been correct on all three grounds, and the circuit court would have properly sustained defense counsel’s objections to such an instruction requested by the prosecution.
¶ 123. However, beginning in 1988 and continuing thereafter, the Mississippi Supreme Court has consistently held that a defendant is entitled to an instruction on a lesser “non-included” charge. Griffin, 533 So.2d at 447-48. In so doing, Mississippi has rejected the majority approach and has joined the minority of jurisdictions that allow lesser non-included-offense instructions. See State v. Corliss, 168 Vt. 333, 721 A.2d 438, 443 (1998) (holding that the practice of allowing lesser non-included-offense instructions “is followed in only a minority of jurisdictions”). The supreme court has recently reiterated that a defendant is entitled to a lesser non-included-offense instruction under certain circumstances. Brooks, 18 So.3d 833, 841 (¶ 36). The Mississippi Supreme Court has also held as follows:
The defendant may request an instruction regarding any offense carrying a *794 lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment. ... Therefore, if the evidence warrants it, a defendant is entitled to a lesser-offense instruction the same as he would be entitled to a lesser-included-ojfense instruction.
Moore, 799 So.2d at 91(¶ 7) (quoting Gangl, 539 So.2d at 136) (emphasis added). This Court has recognized the Mississippi Supreme Court’s prerogative to conclude that a defendant is entitled to a lesser non-included-offense instruction when such an instruction is supported by the evidence and stated that:
It seems to us that [there are] two competing interests: a defendant’s right to have the jury instructed on his theory of defense and the State’s interest in prohibiting the jury from returning what the State perceives as being a compromised verdict in cases where the evidence might be insufficient to support the greater charge but sufficient to support a lesser offense which is not a lesser-included offense of the greater charge. As between these two competing interests, it is clear the defendant should prevail.
Williams, 797 So.2d at 379(¶ 23).
¶ 124. It is noteworthy that Williams could have submitted a jury instruction that included the substance of his assisted-suicide theory of the case without the option to convict Williams for assisted suicide. There can be no doubt that a defendant is entitled to an instruction on his theory of the case. Williams v. State, 953 So.2d 260, 263(¶ 6) (Miss.Ct.App.2006). Such an instruction would have presented Williams’s theory of the case to the jury, but it would not have invited the jury to compromise its verdict by returning a guilty verdict for assisting suicide. Had Williams submitted such an instruction, and the jury still found that Williams was guilty of murder, there would be no controversy on appeal. This Court would have simply held that the jury, in its discretion, rejected Williams’s theory of the case. However, Williams did not request such an instruction. Williams specifically wanted an instruction that would have allowed the jury to reach a compromised verdict finding him guilty of assisted suicide. The only difference is the lack of an optional conviction component. In my opinion, Williams’s insistence, through his proposed instruction, of presenting to the jury the invitation of convicting him for assisted suicide, is tantamount to allowing a defendant to unilaterally determine the crime for which he wants to be tried. Such a decision should be determined solely by the prosecution — not the accused.
¶ 125. Although the jury could have reasonably found that Williams murdered Demetria, there was evidence that suggested that Demetria died due to suicide. There was also evidence that Williams, in any manner, assisted, advised, or encouraged Demetria to commit suicide. That evidence, viewed in the light most favorable to Williams, triggered the supreme court’s line of cases that a defendant is “entitled” to a lesser non-included-offense instruction. Notwithstanding the previous discussion, as for the merits of granting a defendant an entitlement to a lesser non-included-offense instruction, my personal opinion on the matter is irrelevant. Our mandate is to follow the precedent of the Mississippi Supreme Court, and it has consistently held that a defendant is entitled to a lesser non-included-offense instruction if the evidence supports one. Contrary to the substance of the majority opinion, the assisted-suicide statute does not require that the contemplated assistance or encouragement be persuasive, direct, or sig- *795 nifieant. Assistance or encouragement “in any manner” is sufficient to constitute the crime. As previously mentioned, a defendant is entitled to a lesser non-included-offense instruction “where there is eviden-tiary support that a defendant is guilty of a lesser charge arising from the same nucleus of operative facts.” Green, 884 So.2d at 737(¶ 12) (citing Mease, 539 So.2d at 1329). “In fact, proposed instructions should generally be granted if they are correct statements of law, are supported by the evidence, and are not repetitious.” Id. at (¶ 13).
¶ 126. In my opinion, our mandate as an intermediate appellate court requires that we find that the circuit court erred when it refused Williams’s request for a lesser non-included-offense instruction on assisted suicide. Although I too think the jury got it right when they found Williams guilty of murder, that should play no part in the actual analysis of the issue. We should not attempt to invent some justification to avoid the application of the law regarding lesser non-included-offense instructions in an effort to obtain the result we desire. When the evidence supporting conviction of the greater offense is quite strong, as is true in this case, the application of this court-created right to a lesser non-included-offense jury instruction is problematic at best.
¶ 127. Be that as it may, we do not sit as some hypothetical thirteenth juror in determining whether the evidence justified the requested instruction. Likewise, we are prohibited from reviewing the evidence in the light most favorable to the verdict. Instead, we are directed to review the evidence in the light most favorable to Williams. In my opinion, any review of the evidence in that light necessitates granting the requested instruction as directed by the Mississippi Supreme Court. But for the clearly established precedent, I would join the majority. The record is simply populated with abundant evidence, viewed in the light most favorable to Williams that: (1) Demetria and Williams were lovers; (2) they had a mutual suicide agreement; (3) Williams planted the idea in Demetria’s mind; (4) Williams actively assisted Demetria’s plans by helping her to liquidate her bank account so her mother would have access to that money after Demetria’s death; (5) Williams actively assisted Demetria by acquiring a large quantity of beer so they could dull their senses before they acted pursuant to their agreement; (6) Williams and Demetria hid out at Williams’s apartment incognito for days before the event; (7) Williams assisted Demetria by providing kitchen knives from his kitchen to carry out their suicide agreement; (8) Williams and Demetria were depressed individuals who could be considered particularly susceptible to such unimaginable lovers’ entanglement; and (9) expert testimony was presented that Demetria’s death was consistent with suicide. In my opinion, to say that such evidence is insufficient and too indirect and inconsequential to constitute encouragement or assistance is to ignore the obvious.
¶ 128. I cannot ignore our mandate to act as an intermediate appellate court. Because the majority finds no evidence to support Williams’s request for a lesser non-included-offense instruction, I eollegially and respectfully dissent.
GRIFFIS, J„ JOINS THIS OPINION.

. The author of the relevant portion of the 'Williams decision is the author of the current majority opinion.

. Assuming that Williams had been indicted for and convicted of assisting in a suicide and had appealed, challenging the sufficiency of the evidence, this Court would, in all likelihood, find the evidence legally sufficient to support that conviction under the same facts. However, the majority’s position is that there is no evidence to support granting an assisted-suicide instruction. Accordingly, by extension, the majority implicitly suggests that a trial court faced with the same facts must grant a directed verdict in favor of the defendant. If there is insufficient evidence to support an instruction as the majority finds, then it would defy logic to find sufficient evidence to support a conviction under the same facts. To hold otherwise would be intellectually dishonest.

. The Mississippi Supreme Court first adopted the entitlement to a lesser non-included-offense instruction in Griffin v. State, 533 So.2d 444 (Miss.1988). We continue to follow that doctrine despite its rejection by the United States Supreme Court and the vast majority of state jurisdictions. It is ironic that, in this area of jurisprudence, Mississippi could be considered more “liberal” in its treatment of accused defendants as compared to California’s treatment of the same.